**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Northwest Airlines, Inc.,

Plaintiff,

v.

Local 2000, International Brotherhood of Teamsters; Billie Davenport; Al Habib; Danny Campbell; Anne Toombs; Lovey Offerle; Joan Prince Crandall; Shadlea Bennett-Williams; Andrew Damis; Contract Action Team of Local 2000; HAVOC Committee of Local 2000; Rank and File Action Team of Local 2000; Jose Ibarra, Kristi Valenzuela; Bierne Desilets; Scott Vanspeybroeck; Carl Badynee; Dorothy Hutchinson; Ashley McNeely; Khaki Androsiuk; Gary Helton; Bob Boehm; Lou Rudy; Kevin Griffin; Ted W. Reeve; International Brotherhood of Teamsters, AFL-CIO; John Does 1-100; and Jane Does 1-100,

Defendants.

Civil No. 00-08 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Tim Thornton, Esq., Briggs & Morgan, 2400 IDS Center, 80 South 8th Street, Minneapolis, MN 55402, and John J. Gallagher, Esq., appeared on behalf of Plaintiff.

Michael Bloom, Esq., Richard A. Miller, Esq., and Robert Alfton, Esq., Miller O'Brien Bloom, P.L.L.P., 1208 Plymouth Building, South 6th Street, Minneapolis, MN 55402-1529, appeared on behalf of Defendants International Brotherhood of Teamsters, AFL-CIO; Local 2000, International Brotherhood of Teamsters; and Billie Davenport.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 5, 2000, pursuant to Plaintiff's Application for a Temporary Restraining Order. In the Complaint, Plaintiff alleges violation of the Status Quo Requirements

FILED JAN 05 2000
FRANCIS E. DOSAL CLERK
JUDGMENT ENTD
DEPUTY CLERK

of Sections 5 and 6 of the Railway Labor Act ("RLA"); violation of Section 2 First of the RLA; interference with contract; and interference with prospective contractual relations. For the reasons set forth below, Defendant's motion is granted.

## Background

Defendant Local 2000, International Brotherhood of Teamsters ("Local 2000") is a subordinate unit of the International Brotherhood of Teamsters, AFL-CIO ("IBT"), which represents all teamster-represented employees of Plaintiff Northwest Airlines, Inc. ("NWA"). Local 2000 administers the collective bargaining agreement between NWA and IBT for NWA employees. NWA and IBT are parties to a collective bargaining agreement executed on July 30, 1993, which governs pay rates, rules, and working conditions for NWA's flight attendants. The collective bargaining agreement expired on August 1, 1996, but the terms of the agreement remain in effect pursuant to the status quo provisions of the RLA, 45 U.S.C. §§ 155-56.

In May of 1996, the parties began negotiating amendments to the flight attendant collective bargaining agreement. In October of 1998, the parties requested the mediation services of the National Mediation Board ("NMB") pursuant to Section 5 of the RLA. In June of 1999, the parties reached a tentative agreement on the terms of the new contract; however, the Local 2000 membership overwhelmingly declined to ratify the tentative agreement in a vote in August of 1999.

On December 7, 1999, the NMB Mediator, NWA, and Local 2000 resumed contract negotiations. Local 2000 presented new proposals. The NMB Mediator apparently concluded that the new union proposals represented a tremendous deviation from the status of negotiations in June of 1999 and recessed the negotiations indefinitely to allow the union to reassess its

position. At present, negotiations are at a stand-still, but the NMB Mediator has not released the union from the mediation process to pursue self-help measures.

In an April, 1999, edition of "Common Ground," the Local 2000 newsletter, the Local 2000 Executive Board discussed the possibility of a strike to force negotiations with NWA:

> If necessary we can use a special strike tactic called HAVOC ["Having A Voice in Our Contract"] or "CHAOS," which was used successfully by Flight Attendants at Alaska Airlines in 1993. Alaska Flight Attendants carefully struck only the airline's most profitable routes, while allowing most Flight Attendants to stay on the job and support their fellow strikers.
>
> Support from these Flight Attendants, along with backing from the community, was critical to their victory. Selective striking gave Flight Attendants control over the airline's schedule. They decided which planes would fly and which could be canceled at a moment's notice.

(Ex. 3.[1]) Another undated flier, which was not officially endorsed by the union, describes HAVOC as "a strike action that utilizes random, unannounced work stoppages." (Ex. 5.)

The Executive Board of Local 2000 was aware that any sort of strike action or work slowdown prior to a release by the NMB and a 30-day cool down period would be illegal. A February 10, 1999, web forum post by Danny Campbell–again identifying him as the Secretary-Treasurer of Local 2000–notes that "[i]t is hard to communicate HAVOC right now (except in the one on one settings like the presentations we are doing) because we can be sued (BIG TIME) for outwardly promoting strike action prior to a 30 day release into the cooling off period." (Ex. 6.) In response to a web posting calling for an en masse sickout, Gary Helton posted his adamant objection: "Do NOT give a Federal Judge ANY reason to think that there is an organized effort

---

[1] Unless otherwise indicated, all references are to exhibits submitted by the Plaintiff as part of Plaintiff's Motion for Temporary Restraining Order.

to disrupt passenger traffic at NWA. We must NOT be advocating en masse sick calls or we will be slapped with lawsuits . . . ." (Ex. 32.)

The record clearly indicates that the HAVOC campaign, generally, was an officially endorsed union activity. The Local 2000 website provided a form, which could be electronically submitted, for flight attendants to sign up for the HAVOC campaign. (Ex. 2.) A December 12, 1999, web forum post by Danny Campbell–in which he identifies himself as the Secretary-Treasurer of Local 2000–discusses at great length the up coming initiation of the HAVOC program. (Ex. 1.)[2] Further web-postings by Campbell on the Local 2000 website list numerous dates, throughout November, December and early January, for "HAVOC Education Seminars" in various NWA hub cities. (Exs. 11, 14) A December, 1999, letter from Billie Davenport, President of Local 2000, posted on the Local 2000 website, indicates that the union's Executive Board had "set PHASE II in motion. It is during this next step that we are preparing and introducing HAVOC."

As early as October of 1999, flight attendants were posting information about how to call in sick without suffering disciplinary action (Exs. 18, 20), how to avoid being contacted by scheduling to sub for a sick attendant (Ex. 19), and generally advocating a sickout (Exs. 29, 31). An October 31, 1999, posting from "Your Rank and File Team" references the CAT (Contract Action Team) Call In Sick program scheduled for December 1, and urges flight attendants to test the procedures in advance. In response to Gary Helton's admonitions about the illegality of a sickout, urging flight attendants to not publicly advocate such a strategy, another flight attendant

[2] In that posting Campbell does state that "NO . . . the union is NOT (nor will we ever) endorse any type of sick out." (Emphasis in the original.) Another post, by an unidentified flight attendant named "Jeffrey," advocates a "HAVOC" sickout but notes that such a maneuver is not sanctioned by the union. (Ex. 29.)

posted "OK . . . so we just 'happen' to call in sick for the latter part of December." (Ex. 32.) Another flight attendant posted the following on December 18, 1999:

> If you call in sick over the holidays and have not used sick time there is nothing the company can do except maybe require a doctors [sic] note. The union is not going to tell you to call in sick and has to request that all show up for work or they can be sued. READ BETWEEN THE LINES and do what YOU feel good about doing . . . give NW the service that they deserve!

(Ex. 32.)

In mid-December of 1999, NWA began experiencing increased numbers of sick calls from scheduled flight attendants. NWA's statistics indicate that, from December 15, 1999, through January 3, 2000, NWA averaged 744.1 flight attendants unavailable due to illness as compared with a daily average of 474.8 flight attendants unavailable during the same time the previous year. From December 28 to January 2, the number of unavailable flight attendants was nearly double that of the year before. NWA asserts that, after cancelling numerous flights due to decreased demand, it was compelled to cancel over 300 flights due to staffing problems. Moreover, NWA asserts that customer service suffered on many additional flights due to delays and "skeleton crews."

A December 30, 1999, web post exchange between several flight attendants strongly suggests that the increased sick call activity was, and may continue to be, a part of the HAVOC campaign. Jose Arturo Ibarra, a flight attendant identified as the HAVOC coordinator for Local 2000, posted that "[t]here is a plan, and the majority of our Union Leadership is working hard on what they need to do. Their UNIFIED front has become a reality. . . . YES - there is a direction and there is a plan and we all know where we are heading." (Ex. 32.) An unidentified flight attendant responded: "Would you mind sharing that plan with us, instead of that Our Strength is

in our Unity BS." (Ex. 32.) Yet another unidentified flight attendant posted a message "To the previous person wanting info.":

> It's no big secret that most of Northwest's management and Labor Relations is monitorning [sic] this website daily, so it's not too likely you're going to see anything too earth-shattering here. For those who are desperate for information, try attending a union meeting or HAVOC presentation. Heck, why not call the code-a-phone or better yet, read the morning newspaper.

(Ex. 32.) The exchange, while clearly intended to be cryptic, clearly indicates that some sort of HAVOC-related work-action was, on December 30, already underway and having an effect which was reported in the newspapers. Another post, this one dated December 27, 1999, refers to the number of people who had called in sick over the Christmas holiday and speculates that "New Year's Eve will generate an even greater number of participants." (Ex. 34.) This post further suggests that the flight attendants calling in sick are participating in some sort of concerted action.

## Discussion

The test for whether a temporary restraining order or a preliminary injunction should issue was set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.3d 109 (8th Cir. 1981). Typically, a restraining order or an injunction may be granted only on consideration of:

(1) the threat of irreparable harm to the movant;

(2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

(3) the probability that movant will succeed on the merits; and

(4) the public interest.

Id. at 113. In the case of injunctive relief sought to enforce the status quo in a bargaining process governed by the RLA, the movant need not demonstrate irreparable harm. *Consolidated Rail Corp. v. Railway Labor Executives' Association et al.*, 491 U.S. 299, 303 (1989).

Injunctive relief is considered to be a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above, *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

The Railway Labor Act governs labor relations between common carriers and their employees. The RLA provides for a rather extensive process of contract negotiation, during which the parties to the negotiations are prohibited from engaging in any activity–including some form of economic self-help such as a strike, work stoppage, work-to-rule campaign, or sickout–which disrupts the *status quo*. Such self-help activities are allowed only after a mediator from the National Mediation Board has declared the parties at an impasse, the mediator has released the parties from further mediation, and a 30-day "cool down" period has expired.

In response to the increased sick calls, which NWA asserts are part of a union-organized concerted effort to motivate contract negotiation, NWA asks the Court to enjoin the union, its officials, and its members from "engaging in an illegal job action and disruption of air transportation in violation of the collective bargaining procedures and *status quo* requirements of the Railway Labor Act ('RLA'), 45 U.S.C. §§ 151-188." (Memorandum of Points and Authorities in Support of Plaintiff's Motion for Temporary or Preliminary Injunction at 1.) Federal Courts have, quite recently, held that sickout campaigns by airline employees conducted prior to exhaustion of RLA procedures are illegal. *American Airlines, Inc. v. APA*, 53 F. Supp.2d

909 (N.D. Tex. 1999); *American Airlines Inc. v. TWU*, C.A. No. 499-CV-1066 (N.D. Tex. Dec. 29, 1999).

IBT, Local 2000, and Billie Davenport ("represented Defendants") have opposed NWA's application for a Temporary Restraining Order on two primary grounds: (1) that there is no clear nexus between the increased number of sick calls and any union action and (2) that Counts 2, 3, and 4 of the Complaint fail to set forth claims upon which relief could be granted.

The represented Defendants argue that the Norris-LaGuardia Act prohibits any injunction against the union or its officials absent "clear proof" that such union or officials participated in, authorized, or ratified the allegedly illegal activity performed on the union's behalf. In other words, the Norris-LaGuardia Act prohibits an injunction of a wildcat strike pursuant to the RLA. The represented Defendants assert that the record is devoid of any indication that the union or its officers participated in, authorized, or ratified a sickout. Rather, they argue, the record is replete with notices from the union urging flight attendants *not* to engage in any type of slowdown or sickout, because such activity would be illegal.

The Court is not persuaded by the arguments of the represented Defendants. There is some evidence to support the contention that any disingenuous sick calls were in the nature of a wildcat work action.[3] However, there is more persuasive evidence to suggest that officials of Local 2000 (specifically, named Defendants Billie Davenport, Danny Campbell, Andrew Damis,

---

[3] The represented Defendants assert, in the alternative, that most, if not all, of the sick calls are legitimate. The Court takes judicial notice of a rather nasty outbreak of influenza which has filled the beds in hospitals and clinics. However, NWA has submitted an Affidavit sworn out by Robert Brodin, NWA's Vice President of Labor Relations, in which Brodin asserts that he reviewed the records of employee sick leave in other job groups (such as pilots, maintenance, reservationists, and clerical staff) and found no similar jump in sick leave. As he notes, "any epidemic of illness (or Y2K anxiety) among Northwest employees should have been reflected in at least one other job group."

and Jose Ibarra; the Executive Committee of Local 2000; and the members and coordinators of the CAT and HAVOC teams) actively organized and promoted the HAVOC campaign and that the rise in sick calls was a part of that campaign.[4] The fact that union officials made a few public protestations of engaging in a sickout does not compensate for the overwhelming Local 2000 support of the HAVOC campaign and the apparent tie between that campaign and the sickout. The union's public posture may be one of denial, but the evidence indicates that its private strategy is one of advocating a concerted "sickout."

As a result, the Court concludes that, with respect to Count 1 of NWA's Complaint, NWA has demonstrated a likelihood of success on the merits. Moreover, the Court notes that the injunction sought by NWA would simply prohibit the Defendants from engaging in illegal activity; the Defendants can thus claim little legitimate harm from the issuance of an injunction. Although it is not a relevant factor in a matter brought pursuant to the RLA, NWA has also offered evidence that it will experience irreparable harm if the Court declines to grant an injunction. Specifically, NWA has provided sworn statements asserting that it continues to suffer irreparable harm to its reputation and the good will of its customers as a result of flight cancellations, flight delays, and reduced levels of service on flights. Similarly, these factors–flight cancellations, flight delays, and decreased quality of service–support a finding that the public interest is served by issuance of the injunction.

The relief sought by NWA is appropriate on the basis of Count 1 of the Complaint; the validity of the remaining counts would not affect the Court's decision. Thus, the Court need not

---

[4] The same cannot be said of the International Brotherhood of Teamsters, AFL-CIO. The international union appears to have played no direct role in the HAVOC campaign.

reach the merits of the represented Defendants' additional argument, that Counts 2, 3, and 4 of the Complaint fail to state a claim upon which relief might be granted.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. That Plaintiff's Application for a Temporary Restraining Order (Doc. No. 5) is **GRANTED** with respect to all Defendants except International Brotherhood of Teamsters, AFL-CIO;

2. That Defendant Local 2000 and other named Defendants, as officers, representatives, or affiliates of the Defendant Local 2000, and all persons acting by, in concert with, through or under them, or by and through their orders are hereby temporarily restrained pending a hearing on the preliminary injunction in this matter from calling, permitting, instigating, authorizing, encouraging, participating in, approving of, or continuing any disruption of Northwest Airlines, Inc.'s normal airline operations, including but not limited to strikes, work stoppages, sickouts, slowdowns, and concerted refusals to work prior to exhaustion of the collective bargaining procedures of the RLA;

3. That the said Defendants and said other persons acting in concert with them shall immediately take all reasonable steps within their power to prevent the aforesaid actions and to refrain from continuing the aforesaid actions, if commenced;

4. That the said Defendants notify, by the most expeditious means possible, all Local 2000-represented employees of NWA of the contents and meaning of this Temporary Restraining Order and provide NWA with a copy of all such notices;

5. That the said Defendants be prepared, in the event of a hearing on a Motion for Preliminary Injunction, to provide evidence of compliance with this Order; and

6. That the Court shall, absent stipulation of the parties, contact the parties to schedule a hearing on the Motion for Preliminary Injunction consistent with the Federal and Local Rules.

Dated: January 5th, 2000

DONOVAN W. FRANK
Judge of United States District Court